**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

F I L E D
SEP 1 2 2007
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN RE BEARINGPOINT, INC.          )
SECURITIES LITIGATION,            )
                                  )
                                  )   Civil Action No. 1:05-cv-454
THIS DOCUMENT RELATES TO:         )
ALL ACTIONS                       )
                                  )

## MEMORANDUM OPINION

### I. Introduction

On behalf of a class, Lead Plaintiff Matrix Capital Management Fund LP ("Plaintiff")

alleges violations of the Securities Exchange Act and implementing regulations, arguing that

Defendants defrauded the market by knowingly or recklessly publishing false financial

information despite awareness of BearingPoint's "lax internal controls" and dysfunctional

accounting systems. Plaintiff also alleges that Defendants made a series of misrepresentations and

omissions regarding the timing and magnitude of a $397 million goodwill impairment charge

precipitated largely by a reduction in the value of recently acquired European companies.

Because the Court holds that the First Amended Consolidated Complaint ("Complaint")

fails to meet the scienter pleading requirements set forth in the Private Securities Litigation

Reform Act of 1995 as to any of the three Defendants, it dismisses the complaint.

1

## II. Background

### A. Factual Background

Plaintiff represents a class of investors who purchased or otherwise acquired securities of Defendant BearingPoint, Inc. ("BearingPoint") during the Class Period (between August 14, 2003 and April 20, 2005). The defendants in this case are BearingPoint, Randolph C. Blazer (BearingPoint's President, CEO and Chairman of the Board until November 10, 2004), and Robert S. Falcone (BearingPoint's Executive Vice President and CFO from April 2003 until November 30, 2004).

In 2001, BearingPoint was known as KPMG Consulting, LLC. KPMG Consulting, LLC was spun off from KPMG, LLC in 2000 when the "Big Five" accounting firms separated their auditing and consulting practices. BearingPoint provides various consulting services to its clients in the areas of business and technology, systems design and architecture, and network and systems integration (1st Am. Compl. ¶ 21; App. 1164[1]). As of December 31, 2004, BearingPoint had about 16,800 full-time employees worldwide and $3.3 billion in revenue (App. 1174, 1186).

In early February 2001 BearingPoint (then KPMG Consulting) went public, raising $2.2 billion (1st Am. Compl. ¶ 3). In late 2001 it embarked on an aggressive global growth strategy in Europe, Asia and South America, acquiring more than thirty consulting companies from various parts of the world (1st Am. Compl. ¶ 3; App. 97-100). Each acquired company had its own financial systems. *Id.* As a result, BearingPoint had to integrate the financial results from more

---

[1] The designation "App." refers to the Appendix of SEC Filings filed in support of Defendants' Motion to Dismiss. The Court takes judicial notice of these documents pursuant to Fed.R.Evid. 201(d), and may consider them on a motion to dismiss. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

2

than thirty different business units around the world, most of which previously had no experience in compliance with U.S. public accounting standards. *Id.*

At the time of these acquisitions, the company relied on a financial reporting system called PEAT (1st Am. Coml. ¶ 3). Beginning in 2003, the company introduced a new financial accounting system called "OneGlobe" that was intended to bring all North American operations under the same system (1st Am. Compl. ¶ 4). The implementation of OneGlobe was by all accounts problematic. Training was inadequate and errors forced BearingPoint employees at times to bypass OneGlobe and revert to the old Hyperion accounting system or use Excel (1st Am. Compl. ¶¶ 54-66). The Complaint alleges an executive vice-president informed Defendant Blazer by phone that the numbers coming from OneGlobe were unreliable, but also that "[t]he former executive vice president would then have to correct the errors by manually marking up the reports and sending the corrections to the financial services division in Atlanta, Georgia to input" (1st Am. Compl. ¶ 58). Significantly, the Complaint does not allege any additional specific facts regarding Blazer or Falcone's knowledge of accounting errors, and does not allege that BearingPoint ever reported uncorrected financial information to the investing public.

BearingPoint was unable to smoothly integrate the accounting systems of its foreign acquisitions into its overall operations (1st Am. Compl. ¶ 4). The problems were particularly acute in the Asia Pacific region (specifically China, Japan and Australia), where local management allegedly manipulated "utilization" rates – the percentage of consulting time actually billed to customers (1st Am. Compl. ¶¶ 7, 49). Notably, the Complaint does not allege that any BearingPoint officer in the United States had knowledge of these foreign accounting

3

improprieties.

The Sarbanes-Oxley Act was signed into law on July 30, 2002. It required that senior

executives of public companies review and certify the accuracy of financial reports. In accord,

Mr. Blazer and Mr. Falcone each certified the allegedly false financial statements, attesting, *inter*

*alia*, that the filings "fairly present[ed], in all material respects, the financial condition and result

of operations" and disclosed any material changes in BearingPoint's internal financial controls.

(1st Am. Compl. ¶¶ 101, 103, 109, 116, 121, 126, 132).

### B. BearingPoint's Financial Statements

On April 20, 2005, BearingPoint announced to the investing public that it expected to take

a goodwill impairment charge of between $250 million to $400 million, and that its prior financial

statements for 2003 and 2004 were not reliable because of errors. More specifically, BearingPoint

warned that errors in its Form 10-Q filing for the first three quarters of fiscal year 2004, and in its

Form 10-K filing for the fiscal year ended June 30, 2003, and for the six month transition period

ending December 31, 2003,[2] would require restatement of its earnings for those periods. This

announcement also disclosed that BearingPoint was the target of an informal SEC investigation

into its accounting and financial reporting, and that nine of BearingPoint's top twenty executives

had left or were in the process of leaving BearingPoint. Immediately after these disclosures, the

price for BearingPoint's publicly traded shares dropped 32 percent from a closing price of $7.77

per share on April 20, 2005 to a closing price of $5.28 per share on April 21, 2005. This drop in

---

[2] During 2003, BearingPoint decided to shift from a fiscal year ending June 30 to a more
conventional fiscal year ending December 31. Accordingly, it filed a 10-K for the year ending
June 30, 2003, and for the six month transition period ending December 31, 2003.

4

share price occurred on a trading volume of 67,749,504 shares, over forty-six times the stock's average daily trading volume for the year preceding the announcement. Within weeks, several securities fraud lawsuits were filed in this District[3] against BearingPoint and its officers. Subsequent to this disclosure, BearingPoint has spent in excess of $100 million to review and restate its books for the last six months of 2003 and the first three quarters of 2004.

The announcement on April 20, 2005, did not come entirely out of the blue. In the six months prior, BearingPoint had acknowledged problems or potential problems with its financial controls on three separate occasions: (i) an amended Form 10-Q filing for the period ending September 30, 2004 (filed on November 17, 2004), (ii) a Form 8-K filing of December 16, 2004 concerning the offering of convertible debentures, and (iii) a Form 8-K filing of March 18, 2005 announcing BearingPoint's entry into a new credit agreement.

The amended 10-Q filed on November 17, 2004, disclosed that after its original 10-Q filing on November 8, 2004 (for the period ending September 30, 2004), BearingPoint discovered that $92.9 million had been erroneously recorded as accounts receivable when that amount should have been recorded as unbilled revenue. This amendment did not affect BearingPoint's income statement for that period or its net cash flow for the period. Further, the Form 10-Q/A disclosed the following:

> [T]he Company's disclosures controls and procedures as of September 30, 2004 were not effective to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.

---

[3] BearingPoint's principal executive offices are located in McLean, Virginia, making venue proper in this Court (1st Am. Compl. ¶ 18).

This statement was largely ignored by the market, which reacted by reducing the stock price only 42 cents, from $9.42 per share to $9.00 per share on trading volume of 3,256,700.

Similarly, BearingPoint's Form 8-K of December 16, 2004, which was filed in connection with an issuance of convertible debentures, repeated that management had discovered material weaknesses in its internal control components and noted that failure to promptly address the internal control problems could "materially and adversely impact our business, our financial condition and the market value of our securities and expose us to litigation and scrutiny from private litigants and the Securities and Exchange Commission" (App. 1073). The market's reaction was again quite modest: BearingPoint's share price dropped on December 16, 2004, from $8.48 to $7.75 per share on a trading volume of 13,329,500 shares, and again the next day, on December 17, 2004, from $7.75 to $7.59 per share on a trading volume of 19,197,300 shares.

In its Form 8-K filing of March 18, 2005, in which BearingPoint announced the terms of its amended credit agreement with certain lenders, BearingPoint disclosed additional bad news, namely: (i) that BearingPoint expected to take a material goodwill impairment charge of potentially more than $230 million; (ii) that BearingPoint had informed the SEC that it would not timely file its Form 10-K for the year ended December 31, 2004, or its Form 10-Q for the quarter ended March 31, 2005; (iii) that BearingPoint's internal financial controls remained ineffective; (iv) that BearingPoint expected its independent auditors to issue an adverse opinion on the effectiveness of its internal controls; (v) that BearingPoint had identified items in previous period financial statements for the fiscal year ending December 31, 2004, that would probably require adjustments; and (vi) that Moody's Investor's Services, Inc. and Standard and Poor's Rating

6

Services downgraded BearingPoint's credit rating in December 2004 to "below investment grade." Pardoxically, the market reacted positively to this filing: The next day BearingPoint's share price actually rose 13 percent from $7.55 per share to $8.53 per share on a trading volume of 8,067,900.

After the April 2005 stock drop, BearingPoint undertook an extensive audit in conjunction with the independent public accountants PriceWaterhouseCoopers ("PWC"). On January 31, 2006, BearingPoint filed a long overdue Form 10-K for the fiscal year ending December 31, 2004 (1st Am. Compl. ¶¶ 15, 39). BearingPoint reported a $397.1 million impairment charge to goodwill associated with its overseas operations for the fourth quarter of 2004 (App. 1190). The restatement increased BearingPoint's net loss for the six months ended December 31, 2003, by about $10.8 million (1st Am. Compl. ¶ 117; App. 1186) (showing net income as $10.8 million less than previously reported). The restatement in net income for the first three quarters of 2004 totaled $63.7 million. *See* (1st Am. Compl. ¶¶ 40, 122, 127, 135) (tables showing restated net income differentials of $18.6 million for Three Months Ended March 31, 2004; $37.6 million for Three Months Ended June 30, 2004; $7.5 million for Three Months Ended September 30, 2004). The fourth quarter previously had not been reported and thus was not restated (App. 1162). The restatement corrected overstatements of revenue for Q3 2004, Q2 2004 and the six months ended December 31, 2003, and an understatement of revenue for Q1 2004 (App. 1271-73, 1327).

The January 10-K also included a summary of the Audit Committee Investigation into issues reported in the March and April 2005 8-K's (App. 1166-67). The Audit Committee Investigation concluded that BearingPoint's internal control over financial reporting in 2004 was

7

deficient, but did not find that BearingPoint's senior management engaged in any intentional fraudulent acts. *See* (1ˢᵗ Amend. Compl. ¶¶ 43-46; App. 1160-1381).

### C. Procedural History

Plaintiff's first claim, against all Defendants, alleges a violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 of the implementing regulations. The second claim, against the Individual Defendants Randolph Blazer and Robert Falcone, alleges a violation of Section 20(a) of the Securities Exchange Act.

The original complaint was filed on April 25, 2005. Seven similar cases were filed against BearingPoint around the same time. District Judge T.S. Ellis III ordered the cases consolidated on June 27, 2005, and designated 1:05-cv-454 as the lead case. On July 26, 2005, after motion practice directed at the issue, Matrix was selected as lead plaintiff for the putative class and ordered to file an amended complaint. Matrix filed an Amended Consolidated Complaint on October 7, 2005.

After briefing and a hearing, Judge Ellis certified the class in a written Memorandum Opinion on January 17, 2006. Matrix filed the Complaint on March 10, 2006. It remains the operable complaint. Defendants filed motions to dismiss the Complaint under Rule 12(b)(6), and Judge Ellis heard argument on those motions on May 5, 2006, taking the matter under advisement.

There was no further action until March 23, 2007, when Judge Ellis stayed the case pending the Supreme Court's decision in *Tellabs, Inc., et al. v. Makor Issues & Rights, Ltd., et al.*, 127 S. Ct. 2499 (2007) ("*Tellabs*"). The Supreme Court heard argument in *Tellabs* on March 28, 2007, and issued an opinion on June 21, 2007. *Id.* As explained below, *Tellabs* gave further

8

instruction to courts assessing scienter allegations under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). On June 25, 2007, Judge Ellis lifted the stay and ordered the parties to submit simultaneous briefing on the impact of *Tellabs* by July 16, 2007.

On July 13, 2007 the seven consolidated cases were reassigned to this Court, and the Court heard oral argument on Defendants' Motions to Dismiss on July 27, 2007.[4]

## III. Applicable Standards

### A. Motion to Dismiss

In considering a motion to dismiss a complaint, a court must read the complaint as a whole, construe the complaint in the light most favorable to the plaintiffs, and take all alleged facts as true. *See* Fed. R. Civ. P. 12(b)(6); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). "However, conclusory allegations regarding the legal effect of the facts alleged need not be accepted." *In re Cable & Wireless, PLC, Securities Litigation*, 321 F. Supp. 2d 749, 759 (E.D. Va. 2004); *see also Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995).

This initial standard governs how the Court construes the complaint. *See In re Cable & Wireless*, 321 F. Supp. 2d at 759. The following sections set forth the substantive pleading standard for a securities claim under Section 10(b) of the Securities Exchange Act and Rule 10b-5 in light of the PSLRA, the recent Supreme Court decision *Tellabs*, and applicable Fourth Circuit precedents.

---

[4] Citations to the transcript of the July 27, 2007 oral argument are designated herein as "Tr. __."

### B. Securities Fraud Claims Under § 10(b) and Rule 10b-5

To establish liability under Section 10(b) of the Securities Exchange Act of 1934, 15

U.S.C. § 78j(b), and under Rule 10b-5, 17 C.F.R. § 240.10b-5, a plaintiff must allege four

elements: (1) the defendant made a false or misleading statement or omission of material fact, (2)

with scienter (intent), (3) upon which the plaintiff justifiably relied, (4) that proximately caused

the plaintiff damages. *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 342 (4th Cir.

2003).

### C. Pleading Scienter Under the PSLRA

Although Rule 9(b) of the Federal Rules of Civil Procedure requires specific pleading in

certain types of cases, including those alleging fraud, "inconsistent application and interpretation

of Rule 9(b) and other abuses in securities cases prompted Congress to enact the PLRSA."

*Teachers' Ret. Sys. of Louisiana v. Hunter*, 477 F.3d 162, 171 (4th Cir. 2007) ("*Teachers*'"); *see*

*also Tellabs*, 127 S. Ct. at 2504 ("As a check against abusive litigation by private parties,

Congress enacted the [PSLRA]"). The PSLRA sets forth "exacting pleadings requirements" for

alleged securities violations. *Tellabs*, 127 S. Ct. at 2504. It requires "plaintiffs to state with

particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*,

the defendant's intention 'to deceive, manipulate, or defraud.'" *Id.* Plaintiffs must "state with

particularity facts giving rise to a *strong inference* that the defendant acted with the required state

of mind." 15 U.S.C. § 78u-4(b)(2) (2007) (emphasis added).

Congress left the term "strong inference" undefined in the PSLRA. *Tellabs*, 127 S. Ct. at

2504-05. The Supreme Court recently fleshed out its meaning: "To qualify as 'strong' within the

intendment of § 21D(b)(2), we hold, an inference of scienter must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id. Tellabs* further clarifies that "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court *must* take into account plausible opposing inferences." *Id.* at 2509 (emphasis added). Ultimately, "the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 2510.

> *Tellabs* demands a holistic evaluation of the complaint and supporting documents. [C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. The inquiry...is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. *Id.* (emphasis in original).

In securities cases, a court may rely on public documents relied upon and incorporated by reference in the complaint without converting the Rule 12(b)(6) motion into a motion for summary judgment. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

In the Fourth Circuit, a plaintiff may allege scienter by pleading facts giving rise to a strong inference of either intentional misconduct or recklessness. *See Ottman*, 353 F.3d at 343-344.[5] "Mere negligence will not suffice." *Id.* at 343. The Fourth Circuit defines "recklessness"

---

[5] In *Tellabs*, the Supreme Court did not reach the question of whether reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b-5. *See* 127 S. Ct. at 2507, n.3. The Court noted agreement among the Circuits that have considered the issue, even though "the Circuits differ on the degree of recklessness required." *Id.* Thus, this Court is bound by *Ottman*'s articulation of recklessness and will apply that standard here.

as "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (citing *Phillips*, 190 F.3d at 613). This does not lower the bar much below intentional fraud: "Such 'severe recklessness' is, in essence, a slightly lesser species of intentional misconduct." *Ottman*, 353 F.3d at 344.

Finally, the PSLRA provides that any complaint that does not meet its pleading requirements "shall" be dismissed. *See* 15 U.S.C. § 78u-4(b)(3)(A) (2007).

### D. The Fourth Circuit's Bar On Group Pleading

The Fourth Circuit rejects the so-called "group pleading" doctrine, by which a plaintiff may allege scienter generally against a group of defendants. *See Teachers'* 477 F.3d at 184-185; *see also Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 594 (E.D. Va. 2006) ("Group pleading fails to satisfy the requirement that the who, what, where, why and when of the fraud be specified"). Rather, plaintiffs must specifically allege scienter on the part of each individual defendant. *Teachers'*, 477 F.3d at 184. "[T]o allege a securities fraud claim against individual defendants, a plaintiff must allege facts that support a 'strong inference' that *each* defendant acted with at least recklessness in making the false statement." *Id.* (emphasis in original). Additionally, to properly allege a securities fraud claim against a corporation, "the plaintiff must allege facts that support a strong inference of scienter with respect to at least one

12

authorized agent of the corporation, since corporate liability derives from the actions of its

agents." *Id.*[6]

## IV. First Claim Under Section 10(b) and Rule 10b-5, Against All Defendants

### A. Allegedly Materially False or Misleading Statements and Omissions

An actionable statement or omission must be (1) demonstrable as true or false, and (2)

"material," or information that a reasonable purchaser of a security would consider important in

deciding whether to buy or sell the security. *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682-83

(4th Cir. 1999). The allegations of material falsity in the Complaint can be loosely grouped into

three categories: (1) BearingPoint's erroneous financial statements issued during the Class Period,

(2) its statements regarding the adequacy of its internal controls during the Class Period, and (3)

its statements (and alleged omissions) regarding goodwill during the Class Period.

#### 1. BearingPoint's Financial Statements

It is not disputed that many of BearingPoint's financial statements for 2003 and 2004

contained material errors. Accordingly, the Court must analyze whether the Complaint adequately

---

[6] The Fourth Circuit in *Teachers'* cited *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 363-67 (5th Cir. 2004) and the Seventh Circuit's opinion in *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 437 F.3d 588, 602-03 (7th Cir. 2006). In *Southland*, the Fifth Circuit rejected group pleading on the grounds that it conflicts with the PSLRA: "The PSLRA reinforces the particularly requirements of Rule 9(b), requiring the plaintiffs to state not only the time, place, the identity of the speaker, and the content of the alleged misrepresentation, but also to explain with the challenged statement or omission is false or misleading." *Southland, 365. F.3d.* at 363. "Even if this court were to conclude that the 'group pleading' doctrine existed in the absence of the PSLRA, it cannot withstand the PSLRA's specific requirement that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* at 364. In *Tellabs*, the Supreme Court did not disturb the Seventh Circuit's bar on group pleading. *See Tellabs*, 127 S.Ct. at 2511, n.6 ("The Seventh Circuit held that allegations of scienter made against one defendant cannot be imputed to all other individual defendants...Though there is disagreement among the Circuits as to whether the group pleading doctrine survived the PSLRA...the Shareholders do not contest the Seventh Circuit's determination, and we do not disturb it") (internal citations omitted).

pleads scienter against any Defendant with respect to the false financial statements. *See infra*, Part B.

### 2. Internal Controls

Plaintiff asserts that BearingPoint's "lax internal controls" during the Class Period "provided a perfect springboard for the false financial reporting." (1ˢᵗ Am. Compl. ¶ 44; *see also Id* at. ¶¶ 42-48). Plaintiff further alleges a material omission in that Defendants failed to disclose "that the Company lacked an adequate system of internal controls and was therefore unable to ascertain the true financial condition of the Company." (1ˢᵗ Am. Compl. ¶ 139). Defendants, in turn, argue that BearingPoint disclosed truthful information regarding the deficiencies in internal controls throughout the Class Period and that these disclosures negate any inference of scienter.[7]

In April 2004, BearingPoint represented that "[t]he Company has made significant improvements in its internal controls over financial reporting since July 1, 2003 (including during the quarter ended December 31, 2003), and the Company has resolved the material weaknesses reported in its last Annual Report on Form 10-K" *See, e.g.*, (App. 533, April 16, 2004 10-K). On November 8, 2004, BearingPoint filed a 10-Q reporting "no change in the Company's internal control over financial reporting" in the third quarter of 2004 (App. 969, Nov. 8, 2004 10-Q) ("There has been no change in the Company's internal control over financial reporting that has occurred during the third quarter of calendar year 2004 and that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting").

---

[7] *See* (App.125, 313-316, 363, 401, 410-412, 533, 761-763, 969-970, 1058, 1073-74, 1103-1106).

14

Ten days later, however, BearingPoint announced that "subsequent to November 9, 2004" it had discovered a material accounting error for third quarter 2004 (App. 1058, Nov. 18, 2004 10-Q/A). It disclosed additional "weakness in its internal controls relating to overall financial review and analysis[.]" *Id.* On December 16, 2004, BearingPoint cataloged several inaccuracies in its prior disclosures regarding internal controls and warned: "it is more likely than not that, notwithstanding remedial actions that might be taken by management to remedy our internal controls deficiencies, our independent registered public accounting firm either will provide an adverse opinion to the effect that our internal controls are ineffective as of December 31, 2004, or will disclaim an opinion as to our internal controls" (App. 1074, Dec. 16, 2004 8-K). On March 18, 2005, BearingPoint disclosed that management had "identified a number of control deficiencies," that "internal control over financial reporting is ineffective," and again warned that management "expect[ed] that [its] independent registered public accountants will issue an adverse opinion on the effectiveness of [its] internal control over financial reporting" (App. 1104-1105, March 18, 2005 8-K).

Thus, in the six months preceding the close of the Class Period, BearingPoint issued three warnings that its internal controls had material deficiencies, and disclaimed earlier representations to the contrary. Any investor who might have purchased stock in reliance upon BearingPoint's prior assurances regarding the state of its internal controls presumably would have been warned of problems well before the April 20, 2005, stock drop. Nonetheless, as Judge Ellis observed in his Memorandum Opinion certifying the Class on January 17, 2006, "the dramatic drop in the price of BearingPoint stock after the April 20, 2005 disclosure supports the conclusion that the shares

continued to be inflated by BearingPoint's alleged earlier misrepresentations despite any partial

disclosures in 2004." In accord, the Court finds that whether the disclosures in November and

December 2004 corrected the prior allegedly false statements on internal controls is a question of

fact not properly decided on a motion to dismiss. *See In re Microstrategy, Inc. Sec. Litig.*, 115 F.

Supp. 2d 620, 627 (E.D. Va. 2000).

However, the Fourth Circuit has observed that truthful disclosures of negative information

"militate[] against a finding that [defendants] acted with a culpable state of mind" *Ottman*, 353

F.3d at 348; *see also In re Acterna Corp. Securities Litigation*, 378 F. Supp. 2d 561, 577 (D. Md.

2005) (*citation omitted*) ("disclosures throughout the Class Period of unfavorable information

about the company weigh[] against an inference of scienter"). Even assuming BearingPoint's

disclosures regarding its internal controls amounted to actionable falsity, the Complaint fails to

adequately plead scienter or link intent to defraud on the part of any particular Defendant to any

particular statement regarding internal controls. Plaintiff fails to allege any specific fact

suggesting that any individual at BearingPoint knew that the internal controls were in disarray

prior to discovery of the accounting error on November 9, 2004, after which BearingPoint

consistently warned investors of ongoing problems with its controls and the likelihood of an

adverse opinion from its independent accountants. It makes little sense to suppose that

BearingPoint intentionally withheld disclosure of internal control problems in its November 8,

2004 10-Q, given that it filed an amended 10-Q ten days later disclosing the problems.

Moreover, BearingPoint's November 18 and December 16 disclosures do not square with

Plaintiff's motive theory that Defendants withheld negative information in order to avoid

16

jeopardizing the issuance of private securities in December 2004. A company intent on misleading prospective investors certainly would not file an amended 10-Q announcing problems with its internal controls just weeks before a securities offering.

Thus, the Court holds that the Complaint fails to plead scienter with respect to Defendants' disclosures regarding the state of its internal controls.[8]

### 3. Goodwill Impairment

BearingPoint's goodwill impairment charge accounted for about three-quarters of its 2004 restated losses ($397 of $546 billion) (1st Am. Compl. ¶¶ 5-6; App. 1190). Plaintiff advances two theories of fraud regarding BearingPoint's goodwill disclosures. First, Plaintiff alleges that BearingPoint's affirmative statements regarding goodwill were materially false and intended to mislead the market (1st Am. Compl. ¶¶ 138, 139). Second, Plaintiff argues omission in that BearingPoint hid from the market the *magnitude* of the impairment charge in order to buy time and avoid disrupting the private securities offering in December 2004 (1st Am. Compl. ¶ 138).

Plaintiff's first theory fails because there was no falsity or deceptive intent in BearingPoint's affirmative statements regarding goodwill. In the March 8-K, BearingPoint disclosed that it would be taking a "material" goodwill impairment charge for FY2004, that it was presently unable to provide an estimate of the magnitude, and that although its credit agreement permitted a charge up to $230 million, "[t]he actual amount of the impairment charge may be higher or lower than such amount." (App. 1103). In the April 8-K a month later, BearingPoint gave an estimated range of $250-400 million for the impairment charge. (App. 1127). There is

---

[8] Plaintiff's allegations (1st Am. Compl. ¶¶ 42-48) that the dysfunction in BearingPoint's internal controls was so egregious that Defendants must have known or disregarded errors in its financial statements will be further addressed in Part B below.

nothing facially inconsistent between these two statements - the April 8-K merely gave more specific information. Further, the April 8-K estimate proved to be accurate because the eventual impairment charge of $397 million (finalized in January 2006) fell within the $250-400 million range. Regardless, even if these disclosures were misleading, the Complaint fails to allege that any particular officer or agent of the corporation had the requisite intent. *Teachers'*, 477 F.3d at 184. Neither Mr. Blazer nor Mr. Falcone could be responsible for these statements because both had left the company by the end of November 2004 (1st Am. Compl. ¶¶ 22, 23).

Plaintiff's omission theory also fails. Without alleging specific facts, Plaintiff asks the Court to infer that BearingPoint's management must have known the magnitude of the goodwill impairment charge in late 2004, but withheld the information in order to consummate a private securities sale in December 2004. This inference, however, does not meet the *Tellabs* standard of being "at least as likely" as a competing inference of non-culpability. *Tellabs*, 127 S. Ct. at 2510. First, the Complaint is devoid of allegations suggesting that any BearingPoint officer or agent knew the actual figures in advance of public release. Plaintiff relies on a statement in the January 2006 10-K that "[d]uring the fourth quarter of the year ended December 31, 2004, the Company determined that a triggering event had occurred, causing the Company to perform a goodwill impairment test on all reporting units" (Tr. 27-28; App. 1280). Plaintiff urges the Court to infer from this statement that BearingPoint must have *completed* the impairment calculation in late 2004 and therefore BearingPoint's management withheld the true figures from the market. *Id.* But Blazer and Falcone had left the company by November 2004 (1st Am. Compl. ¶¶ 22, 23). Indeed, their departures were among the "triggering events" that necessitated the impairment test

18

in the first place (App. 1103). This strongly suggests that the calculations of the impairment figure did not begin until *after* Blazer and Falcone had left the company.

Nor does the Complaint allege that the new management team withheld results of a completed impairment test; indeed, no individual from the new management team is named as a defendant. Far from alleging the new management team intended to defraud investors, Plaintiff argues they actually *corrected* many of the problems Blazer and Falcone left behind (1ˢᵗ Am. Compl. ¶¶ 8, 12). For example, in the "Scienter" section the Complaint relies on a press statement of new CEO Harry L. You that "squarely blamed" the accounting problems on the incompetence of former management. (1ˢᵗ Am. Compl. ¶ 52).

Second, the sequence of BearingPoint's disclosures in March and April 2005 argues against an inference of intentional or reckless omission. BearingPoint disclosed bad news in the March 8-K, namely that the impairment charge could be higher than the $230 million allowed under its credit agreement (App. 1103). One month later, it announced even worse news, namely that the impairment charge likely would exceed the allowable $230 million and fall in the $250-400 million range (App. 1127). It simply defies common sense to suppose that a public company withheld bad news to entice investment, while knowing it soon would release even worse news and thereby drive away all of the investment it had just garnered.[9] Further, there is no obvious motive for any alleged omissions after the December 2004 securities sale. The stronger inference

---

[9] Indeed, the 32 percent drop in BearingPoint's stock price on April 21, 2005, on historically-high volume, suggests that any such strategy to capture investment would be quite ineffective.

from this sequence of events is that BearingPoint was in the process of quantifying the impairment charge from late 2004 onward and updating its public disclosures as the numbers solidified.[10]

Finally, the Audit Committee Investigation, conducted in conjunction with independent public accountants at PriceWaterhouseCoopers (PWC), "identified no reason to question the Company's testing procedures and pertinent disclosures in 2004 and 2005 concerning the possible impairment of 'goodwill'" (App. 1166). This finding weighs heavily against scienter.

The Court's conclusion is supported by *Acterna*, where the District Court of Maryland dismissed similar allegations of fraud connected to the announcement of a goodwill impairment. *In re Acterna Corp. Securities Litigation*, 378 F. Supp. 2d 561 (D. Md. 2005). Acterna had acquired two companies in 2000 and incorporated the additional goodwill into its balance sheets. *Id.* at 566-68. Acterna represented that its goodwill figures were accurate in its 2001 and 2002 SEC filings, but reversed course and announced a $338 million goodwill write-off on October 30, 2002. *Id.* The plaintiff argued that defendants had actual knowledge, or were reckless in not knowing, that the company's goodwill was impaired prior to a public announcement. *Id.* The court reasoned that,

> [A]t most, Plaintiffs' allegations would demonstrate that Acterna (and PWC) was conducting the impairment tests...but had not determined whether, and if so, how much, Acterna's goodwill was impaired...Noticeably absent from the complaint is an allegation that *once the analysis was complete*, Acterna and PWC concluded that there was an impairment to goodwill, that the individual Defendants were aware of that conclusion, and that they, nevertheless, consciously misrepresented in their subsequent statements that it was not impaired. *Id.* at 573-74 (emphasis in original).

The alleged facts here compel a similar inference of non-culpability.

---

[10] This inference is further supported by the fact that even after the stock drop on April 21, 2005, it took eight additional months (until January 2006) for the actual impairment figure to be quantified at $397 million. If BearingPoint knew the actual figure before January 2006, it would have been in its interest to release such information and quell the market's uncertainty.

In accord, because there is no falsity with respect to BearingPoint's affirmative statements in SEC filings regarding the goodwill impairment, and there are no grounds supporting a "strong inference" that anyone at BearingPoint knew or should have known the amount of the impairment prior to its public dissemination, the Court holds that the Complaint fails to state a claim for securities fraud based on the goodwill impairment.

## B. Scienter For The Remaining Allegations

### 1. Scienter Of The Individual Defendants

As noted above, "to allege a securities fraud claim against individual defendants, a plaintiff must allege facts that support a 'strong inference' that *each* defendant acted with at least recklessness in making the false statement." *Teachers'*, 477 F.3d at 184 (emphasis in original). Much of the Complaint fails to meet the *Teachers'* standard, as it pleads scienter generally, *i.e.*, against "the defendants," "senior managers," or "senior regional managers," without alleging specifics. *See, e.g.*, (1st Am. Compl. ¶¶ 2, 6, 7, 42, 47, 53). The Complaint is replete with allegations of a general awareness of problems with the OneGlobe system and internal accounting controls, but lacks allegations as to the "specifics as to what defendants had knowledge of and when." *Acterna*, 378 F. Supp. 2d at 575.

The most specific allegation is that Blazer directly questioned a "former executive vice president" about her billing rate, who informed him that the OneGlobe system was producing material accounting errors. (1st Am. Compl. ¶ 58). But it further alleges that "[t]he former executive vice president would then have to correct the errors by manually marking up the reports and sending the corrections to the financial services division in Atlanta, Georgia to input." *Id.* This suggests that although Blazer was aware of OneGlobe's propensity to produce errors, he had

21

reason to believe his subordinates were correcting the errors before the information was disseminated to the public. This does not give rise to a "strong inference" of culpability under *Tellabs*.

The Complaint also alleges that the Individual Defendants prepared and reviewed the Company's monthly, quarterly, and annual reports regarding gross revenue and specific projects (1st Am. Compl. ¶¶ 22, 23, 26, 56). Another paragraph, alleges that Blazer or another top executive was required to approve payments over $1 million (1st Am. Compl.¶ 62). But simply reviewing corporate reports and approving payments are normal functions of a corporate executive and do not amount to allegations of intent or recklessness.

In that vein, Plaintiff argues scienter can be inferred from the fact that CEO Blazer and CFO Falcone "knowingly and/or recklessly" signed Sarbanes-Oxley ("SOX") Certifications attesting to the accuracy of the financial information in the SEC filings (1st Am. Compl. ¶¶ 101, 103, 105, 109, 111, 116, 118, 121, 123, 126, 128, 132, 136). No court in the Fourth Circuit has yet addressed whether scienter for a § 10(b) or Rule 10b-5 violation can be based on SOX Certifications. The only appellate court decision on point, *Garfield v. NDC Health Corp.*, noted that "Sarbanes-Oxley evidences no congressional intent to alter the pleading requirements set forth in the PSLRA" and therefore held that certification "is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006).[11] In other words, the fact that a corporate officer certified financial statements later proved to be erroneous

---

[11] The Eleventh Circuit in *Garfield* reasoned that "[i]f we were to accept [plaintiff's] proffered interpretation of Sarbanes-Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA." *Id.* The Court agrees with this observation.

does not, in and of itself, give rise to an inference of scienter. Rather, there must be other alleged facts establishing that the signor recklessly ignored "red flags" that the attested-to financial statements contained material falsities. *Id.* District courts generally have followed *Garfield* and ascribed little weight to SOX Certifications absent "glaring accounting irregularities" or "other red flags'" supporting an inference of severe recklessness or intent. *In re CP Ships Ltd., Sec. Litig.*, 2007 WL 1068219, *6 (M.D. Fla. 2007); *see also In re Watchguard Sec. Litig.*, 2006 WL 2038656, *9-10 (W.D. Wash., April 21, 2006); *In re Silicon Storage Technology, Inc., Sec. Litig.*, 2007 WL 760535, *17 (N.D. Cal. 2007).

Because the Complaint fails to allege facts suggesting that Blazer and Falcone knew or should have known that the relevant SEC filings were erroneous, the mere act of signing SOX Certifications does not suggest culpability. Nor do the errors in the filings suggest "glaring accounting irregularities" or "other red flags" that Blazer or Falcone should have heeded. The size of the error in BearingPoint's restated net income for the last six months of 2003 was $10.8 million—a figure equal to only 0.007% of BearingPoint's total revenue ($1.5 billion) in 2003 (1st Am. Compl. ¶ 117; App. 1186) (showing net income as $10.8 million less than previously reported). In 2004, BearingPoint over doubled in size, growing to a $3.3 billion revenue company due to its (perhaps overly) ambitious acquisition strategy (App. 1186). The mistakes in stated net income for the first three quarters of 2004 totaled $63.7 million, or about 0.02% of BearingPoint's size in 2004. *See* (1st Am. Compl. ¶¶ 40, 122, 127, 135) (tables showing restated net income differentials of $18.6 million for Three Months Ended March 31, 2004; $37.6 million for Three Months Ended June 30, 2004; $7.5 million for Three Months Ended September 30, 2004). Financials errors of that magnitude certainly are not trivial, but they are not large enough relative

23

to the company's size to be deemed "glaringly obvious" in the overall scheme of BearingPoint's operations and thus compel a strong inference that management recklessly ignored them. *See In re CP Ships Ltd.*, 2007 WL 1068219, *6 (M.D. Fla. 2007) (restatements of net income involving less than 1% of company's total revenues were not "glaringly obvious").

Further, as discussed above, Blazer and Falcone were gone by the end of November 2004. So even if BearingPoint's statements about goodwill in December 2004 and March/April 2005 were actionable, the Individual Defendants could not be liable for them. *See supra*, Part A.3.

A final factor weighing against scienter of the Individual Defendants is the lack of personal financial motive. Although the Supreme Court instructs that a lack of personal financial motive is not dispositive, it remains "a relevant consideration" in assessing scienter. *Tellabs*, 127 S. Ct. at 2511. "In order to demonstrate motive, a plaintiff must show concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged. Merely alleging facts that lead to a strained and tenuous inference of motive is insufficient to satisfy the pleading requirement." *Ottman*, 353 F.3d at 352 (quoting *Phillips*, 190 F.3d at 621). It is undisputed that neither Blazer nor Falcone sold any stock during the Class Period, and the Complaint contains no indication that either individual had a personal financial motive to perpetrate fraud on the market.[12]

For these reasons, this Court holds that the Complaint fails to state a §10(b) claim against the Individual Defendants.

---

[12] *See also In re Acterna*, 378 F. Supp. 2d at 570, n.6. ("Although motive may be a good indication of scienter, simply alleging a defendant's desire to protect his job and compensation is not sufficient, because these motives may be seen as common to all corporate executives.")

## 2. Scienter Of BearingPoint Itself

Because there is no cogent and compelling inference of scienter on the part of Blazer,

Falcone, or any other officer or agent of BearingPoint – the Complaint must be dismissed under

*Teachers'*. *Teachers'*, 477 F.3d at 184 ("[T]he plaintiff must allege facts that support a strong

inference of scienter with respect to at least one authorized agent of the corporation, since

corporate liability derives from the actions of its agents"). Moreover, the scienter allegations

against BearingPoint itself, and "defendants" generally, fail to meet the *Tellabs* standard.

First, the Court cannot infer scienter based upon the mere fact that BearingPoint issued

restated financial statements or failed to adhere to GAAP principles (1st Am. Compl. ¶¶ 6-13).

"[T]he fact that a restatement of financials occurred is not sufficient to raise a strong inference of

scienter, for it is settled that 'scienter requires more than a misapplication of accounting

principles,' and '[m]ere allegations that statement made in one report should have been made in

earlier reports do not make out a claim of securities fraud.'" *Microstrategy*, 115 F. Supp. 2d at

634-635; *see also Cable*, 321 F. Supp. 2d at 772; *In re Orbital Sciences Corp. Sec. Litig.*, 58 F.

Supp. 2d 682, 687 (E.D. Va. 1999); *Chill v. Gen. Elec.*, 101 F.3d 263, 270 (2d Cir. 1996)

("Allegations of a violation of GAAP provisions or SEC regulations, without corresponding

fraudulent intent, are not sufficient to state a securities fraud claim"); *In re Worlds of Wonder Sec.*

*Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994); *In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F.

Supp. 2d 211, 223 (D.Mass. 1999) ("A host of courts have held that a mere failure to recognize

revenue in accordance with GAAP does not, in itself, suffice to establish scienter"); *In re CP Ships*

*Ltd.*, 2007 WL 1068219, *6 (M.D. Fla. 2007) ("The issuance of a restatement, even involving a

25

considerable change in numbers, cannot support a securities fraud lawsuit, absent other evidence of

scienter").

To be sure, *Microstrategy* instructs that the nature and size of a restatement in the overall

context may be circumstantially relevant to state of mind. *Microstrategy*, 115 F. Supp. 2d at 635.[13]

But as discussed above, once the $397 million goodwill impairment charge is discounted, the

restated income figures are quite small relative to BearingPoint's size and sophistication. Changes

in net income that ultimately amounted to a small fraction of one percent of the size of the

company, which were subsequently corrected at great cost, simply do not support a compelling

inference management knew the numbers were wrong or were reckless in not knowing.

Second, much if not most of the Complaint alleges basic corporate mismanagement, not

fraud. For example, under the heading "Scienter," the Complaint alleges that BearingPoint's

management rushed the implementation of the OneGlobe accounting system (1st Am. Compl. ¶¶

53-66), failed to maintain adequate internal controls (1st Am. Compl. ¶¶ 42-48), and overpaid for

the acquisition of European entities (1st Am. Compl. ¶¶ 59-60). Such alleged facts, even if proven,

---

[13] *Microstrategy* presented the court with numerous allegations compelling a "strong inference" of fraudulent intent that are not present in this case, including, *inter alia*: (1) Microstrategy employed "early recognition" of revenue, overstated earnings, and used other accounting tricks wholly inconsistent with simple and basic GAAP principles; (2) Microstrategy consistently overstated revenues over three fiscal years and seven of eight interim quarters, during which time executives touted the "increased revenues" in press statements; (3) the errors in Microstrategy's reported net income were quite large relative to the company's size – a $100-200 million company went from reporting an $18.4 million profit over two years to a $33.7 million loss; (4) these overstatements occurred shortly before, during and after Microstrategy's Initial Public Offering, suggesting a clear motive for fraud (to entice investors to buy securities in a young public company); (5) each of the five individual defendants made private sales of stock during the Class Period, netting over $90 million combined; (6) toward the end of the Class Period, Microstrategy announced its intention to sell 6.5 million shares of stock, 1.6 million of which were owned by one of the individual defendants. *See Microstrategy*, 115 F. Supp. 2d at 623-626.

26

might demonstrate corporate mismanagement—but they do not amount to a securities law violation. *Cable*, 321 F. Supp. 2d at 770 ("As the Supreme Court has held, claims that 'constitute no more than internal corporate mismanagement' are not actionable under the securities laws") (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977)).

OneGlobe:

Plaintiff makes a host of scienter allegations based upon problems with the OneGlobe accounting system. In brief summary, Plaintiff alleges that OneGlobe "never worked properly" and could not be integrated with BearingPoint's worldwide operations (1st Am. Compl. ¶ 53); that "[e]mployees were not properly trained to use OneGlobe" (1st Am. Compl. ¶ 54); that errors appear in the reports reviewed by the Individual Defendants (1st Am. Compl. ¶ 56); that BearingPoint admitted on January 31, 2006, that errors resulted from the poor and premature implementation of OneGlobe and that employees routinely had to bypass the system (1st Am. Compl. ¶ 57); that Blazer was told about the errors but also that they were being manually corrected (1st Am. Compl. ¶ 58); that OneGlobe caused longer turnaround on payments and invoices (1st Am. Compl. ¶¶ 61, 63); that a senior business analyst was told to create financial reports in Excel because OneGlobe "did not work," and that BearingPoint employed seven "reconciliation analysts" to convert data from the old Hyperion accounting system to Excel spreadsheets (1st Am. Compl. ¶ 65).

What is missing from these allegations is any suggestion that uncorrected, erroneous information from OneGlobe made its way into BearingPoint's financial statements with the acquiescence or reckless indifference of BearingPoint's management. The allegations that BearingPoint told a senior analyst to use Excel instead of OneGlobe, had employees revert to the old Hyperion system and employed "reconciliation analysts" and manual markups to square the

27

numbers, all evidence intent to get the numbers right and thus strongly argue *against* scienter. The more plausible inference from the OneGlobe allegations, taken collectively, is that while BearingPoint had problems implementing the OneGlobe system, it took measures to minimize and correct errors. The securities laws do not make actionable the problematic implementation of a new accounting system. Without specific allegations supporting a strong inference that management disregarded errors that ultimately were reported to the investing public, no action lies.

Internal Controls:

Plaintiff alleges that BearingPoint's "lax internal controls" give rise to an inference of scienter for the false financial statements (1st Am. Compl. ¶¶ 42-48, 53). Without alleging specific facts, the Complaint asserts "defendants knew that the Company's systems of internal control were essentially non-existent, or, at a minimum, dysfunctional, such that no accurate, reliable financial reports could be generated" (1st Am. Compl. ¶ 42). Plaintiff further relies on the Audit Committee Investigation's conclusion that BearingPoint's internal control over financial reporting in 2004 was deficient (1st Am. Compl. ¶¶ 43-46). But the Audit Committee Investigation was not initiated until July 20, 2005 (1st Am. Compl. ¶ 43) and the findings were not released until January 31, 2006 (1st Am. Compl. ¶ 46). This is a classic "fraud by hindsight" allegation. *Iron Workers*, 432 F. Supp. 2d at 589 ("[M]ere allegations amounting to fraud by hindsight are insufficient"). Plaintiff cannot piggyback an inference of scienter for the false financials on a subsequent determination by the Audit Committee that the internal controls were inadequate. As the Seventh Circuit recently observed, "[a] report by [defendant's] audit committee accompanying the restated financials…concluded that the reporting system…had not been up to the task of preventing the fraud. That's no news; by definition, *all* frauds demonstrate the 'inadequacy' of existing controls,

28

just as all bank robberies demonstrate the failure of bank security and all burglaries demonstrate the failure of locks and alarm systems." *Higginbotham v. Baxter Int'l, Inc.*, 2007 WL 2142298, *5 (7th Cir., July 27, 2007) (emphasis in original). Further, as discussed above, the sequence and substance of BearingPoint's public disclosures regarding its internal controls are not consistent with an inference of culpability. *See supra*, Part A.; *Acterna*, 378 F. Supp. 2d at 577; *Ottman*, 535 F.3d at 348.

### Overpayment For Foreign Acquisitions:

BearingPoint's alleged overpayment for foreign companies, which led to the goodwill write-down, does not support an inference of scienter. In paragraph 59, the Complaint alleges that BearingPoint "overpaid" for the European entities and that a recession hit Europe "during or immediately after BearingPoint finalized the purchases." In paragraph 60, it alleges that the "recession caused significant losses for the recently acquired operations." An economic recession that reduced the worth of companies after BearingPoint purchased them is not evidence that BearingPoint intentionally misstated their value at the time of purchase. The only plausible inference to draw is that a subsequent intervening event – an economic recession in Europe – drove down the value of the acquired companies and forced a re-evaluation of goodwill. Even if management could be faulted for bad business judgment for failing to predict a European recession, the securities laws do not provide relief for plaintiffs alleging bad economic forecasting or managerial missteps. Acquiring companies is fraught with risk, so the fact that BearingPoint subsequently realized that it overpaid for the European companies and had to write-down goodwill – while perhaps indicative of poor strategic foresight – is not evidence of fraudulent intent. *See Acterna*, 378 F. Supp. 2d at 577.

29

In addition, BearingPoint's explicit disclosures of the risk of overpayment for foreign acquisitions throughout the Class Period further negate any inference of scienter. *See, e.g.*, (App. 763, April 16, 2004 10-K) ("Our growth is dependent in part on our ability to make acquisitions, and we risk overpaying for acquired businesses"); *see also* (App. 313-314, September 29, 2003 10-K); (App. 410-412, Nov. 14, 2003 10-Q).

Investigations:

References in the Complaint to governmental investigations of BearingPoint (1st Am. Compl. ¶¶ 67-76) are similarly non-compelling. The Complaint cites findings of the VA Inspector General that have nothing to do with the alleged fraud, such as a purported finding that BearingPoint did not properly train end-users on its CoreFLS system. *See, e.g.*, (1st Am. Compl. ¶¶ 67-72). The Complaint (1st Am. Compl. ¶ 67) also refers to an alleged DOJ investigation where no official findings of fact or legal conclusions have issued. *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) ("references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial"). Inferring scienter from the mere existence of an investigation would be an end-run around the stringent pleading requirements of the PSLRA, entitling every plaintiff who brought suit against a company under investigation access to discovery.

Executive Departures:

Plaintiff argues that scienter should be inferred from BearingPoint's announcement on April 20, 2005, that nine of twenty top executives "have left the Company or are in the process of leaving" (1st Am. Compl. ¶ 10). This Court recently has held that retirements and resignations of

30

executives do not support a strong inference of scienter. *See Iron Workers*, 432 F. Supp. 2d at 593-94. This is sensible because shakeups of top management are quite likely to occur when a public company has been poorly managed; thus, to assume fraudulent acts have transpired based on the mere fact that executives have left a company is an unwarranted inferential leap.

In this case, the Complaint does not allege that any of the executives departed under a cloud of illegality or accusations of fraud (1st Am. Compl. ¶¶ 10, 80). It fails to name any of the nine "fired" executives (two of whom presumably were Blazer and Falcone), or allege specific facts connecting any particular departure to any prior fraudulent statement or omission. *Id.* The only individual defendants in this lawsuit had left BearingPoint five months prior to this announcement. The stronger inference is that the departures were part of a managerial reorganization, which commonly follows an announcement that a public company has been poorly managed. No inference of fraud can be justifiably drawn. *Iron Workers*, 432 F. Supp. 2d at 593-94.

### 3. Imputing Scienter Based Upon The Alleged Misconduct Of BearingPoint's Foreign Operations

The Complaint alleges that scienter should be imputed to Defendants because certain foreign entities allegedly falsified utilization rates (the percentage of consultants' time billed to clients) and such falsifications were encouraged by the "tone at the top" set by management. *See, e.g.*, (1st Am. Compl. ¶¶ 7, 14, 77). The Fourth Circuit seemingly has not decided whether or when scienter for securities fraud can be imputed to a corporation based upon acts of its foreign divisions or subsidiaries.[14] Other circuits generally have rejected imputing liability based on the acts or

---

[14] The parties dispute whether the foreign entities at issue are subsidiary corporations or merely divisions of BearingPoint. Portions of the Complaint refer to the entities as "subsidiaries in China and Japan." (1st Am. Compl. ¶ 7). At oral argument, Plaintiff's counsel represented that they were segments or divisions, and each party pointed the Court to specific sections in the Appendix referring to them as "segments" and "subsidiaries" alternatively. (App. 1166, 1193). Recourse to other publicly available documents of which the Court may take

omissions of a foreign subsidiary. *Chill v. Gen. Elec.*, 101 F.3d 263, 269-71 (2d Cir. 1996)

(affirming dismissal of securities fraud claim where plaintiffs failed to allege parent corporation's

scienter when it relied on subsidiaries' information in its own financial reporting); *In re Comshare*

*Sec. Litig.*, 183 F.3d 542, 554 (6th Cir. 1999) (citing *Chill* for proposition that courts "should not

presume recklessness or intentional conduct from a parent corporation's reliance on its subsidiary's

internal controls"). Where the foreign operations are not subsidiaries but merely divisions of a

company, courts have refused to impute scienter unless the foreign divisions are so central to the

company's overall business that it was reckless not to keep closer tabs on their numbers. *In re*

*Alpharma Sec. Litig.*, 372 F.3d 137, 151 (3d Cir. 2004) (affirming dismissal where Complaint was

"devoid of allegations" that would establish that Alpharma's Brazil division was "so central to

Alpharma's business that its increased revenue figures should have received particular attention

from company executives"); *Abrams v. Baker Hughes*, 292 F.3d 424, 438 (5th Cir. 2002)

(knowledge of accounting irregularities at a division accounting for 20% of revenue cannot be

imputed to senior executives).

The Complaint does not allege that Blazer or Falcone had any specific knowledge or

awareness of falsified utilization rates or other accounting irregularities in the Asia Pacific region.

*See* (1st Am. Compl. ¶¶ 7, 48). Instead, the Complaint alleges that the manipulation of utilization

rates was directed by "senior regional management" in China and Japan, executed by "employees

in China" and "one senior employee in Australia" (1st Am. Compl. ¶¶ 7, 15, 49, 50). Nor does the

Complaint allege that the Asia Pacific operations were so central to BearingPoint's business that

---

judicial notice did not resolve the issue. Because this is a motion to dismiss, the Court must presume correct
Plaintiff's allegation that the Asia Pacific operations are divisions of BearingPoint rather than separately
incorporated entities.

Blazer and Falcone acted recklessly in relying on their numbers without further inquiry. *Alpharma*, 372 F.3d at 151; *Baker Hughes*, 292 F.3d at 438. In fact, these particular foreign entities comprised a relatively small percentage of BearingPoint's worldwide business.[15] There was no sudden or dramatic increase in their profitability that would have suggested foul play.[16] Plaintiff alleges an improper "tone at the top" that encouraged misconduct abroad, but general allegations of an improper "tone" do not substitute for specific allegations compelling a strong inference that Blazer or Falcone knew or should have known about falsified data. The Complaint simply offers no basis for this inference, and therefore scienter cannot be imputed to any Defendant.

## C. Loss Causation

Defendants argue that the Complaint fails to adequately plead "loss causation," *i.e.*, that the allegedly misrepresentations or omissions proximately caused economic loss. In *Dura Pharm., Inc. v. Broudo*, the Supreme Court held that alleging only an "inflated purchase price" for securities does not suffice, rather plaintiffs must plead an actual economic loss. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005). In the Fourth Circuit, a securities plaintiff must "plead [loss causation] with sufficient specificity to enable the court to evaluate whether the necessary causal link exists." *Teachers'*, 477 F.3d at 186. To ultimately recover, a plaintiff must prove that the alleged misrepresentation was a "*substantial* cause" of the loss. *Miller v. Asensio & Co., Inc.*, 364 F.3d 223, 232 (4th Cir. 2004) (emphasis in original).

---

[15] BearingPoint's *total* foreign operations constituted only 32 percent of BearingPoint's revenues in 2004. The Complaint alleges misconduct in China, Japan and Australia, which together comprised only a small percentage of BearingPoint's foreign business.

[16] Even a large spike in the profits of foreign divisions can be insufficient to presume recklessness on the part of a parent company. *See Chill*, 101 F.3d at 269-270.

33

Plaintiff's loss allegations are contained in paragraphs 151 and 153 of the Complaint. In paragraph 151, Plaintiff alleges that "[h]ad Lead Plaintiff and the other members of the class and the marketplace known of the true financial condition and business prospects of BearingPoint, which were not disclosed by defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their BearingPoint securities, or, if they had acquired such securities during the Class Period, they would not have done so at the *artificially inflated prices which they paid*" (1st Am. Compl. ¶ 151) (emphasis added). This loss allegation fails under *Dura*, as it alleges only "artificially inflated prices," not an actual economic loss proximately caused by any misrepresentation or omission on the part of any Defendant. *Dura*, 544 U.S. at 343-344.

In paragraph 153, however, Plaintiff alleges that the Class suffered damages in connection with their respective purchases of BearingPoint securities because "[t]he price of BearingPoint's securities declined materially upon the public disclosure of facts which had been previously misrepresented or concealed as alleged herein" (1st Am. Compl. ¶ 153). This allegation apparently refers to the 32% drop in BearingPoint's stock price after BearingPoint's release of the April 8-K. Defendants argue that because the information in the April 8-K had already been disseminated in prior public disclosures, it could not have caused any loss. But the April 8-K contained new, more detailed disclosures about inaccuracies in BearingPoint's prior financial statements. Specifically, the April 8-K stated that most of BearingPoint's financial statements for 2003 and 2004 "should not be relied upon because of errors," and that BearingPoint believed that restatements of prior financials would be "necessary."[17] (App. 1127-28). By contrast, the March 8-K contained no

---

[17] The April 8-K disclosed that the 10-Q's for each of the first three quarters of FY04, the 10-K for the six-month transition period ended December 31, 2003, and the 10-K for the fiscal year ended June 30, 2003, "should not be relied upon because of errors in those financial statements" (App. 1127).

34

similarly candid admission that BearingPoint's prior financials were not reliable or categorical notice that a restatement would be "necessary." Instead, the March 8-K disclosed general concerns about "material weaknesses" in BearingPoint's internal controls and a vague warning that a restatement was "probable (App. 1103-06). The new disclosures in the April 8-K may well have been a "substantial cause" of the stock drop on April 21, 2005. *Miller*, 364 F.3d at 232. Indeed, the fact that the market reacted positively to the March 8-K disclosures suggests that the additional information in the April 8-K was particularly alarming to investors.[18]

In summary, Plaintiff alleges an actual loss – a decline in the value of shares purchased by the Class in reliance upon BearingPoint's financial statements during the Class Period – caused by the April 20, 2005, disclosure that BearingPoint's 2003-2004 financial statements could not be relied upon and would need to be restated. *See Teachers'*, 477 F.3d at 187 ("To allege loss causation...plaintiffs would have to allege that the market reacted to new facts disclosed in June 2003 that revealed [defendant's] previous representations to have been fraudulent"). Thus, the Court holds that the Complaint adequately pleads loss causation with respect to the loss allegation in paragraph 153. However, because the Complaint does not adequately plead scienter against any Defendant with respect to any material falsity, Plaintiff's allegation of loss causation does not save the complaint.

---

[18] The day following the March filing, BearingPoint's share price actually rose 13% from $7.55 per share to $8.53 per share on a trading volume of 8,067,900.

**V. Second Claim Under Section 20(a), Against The Individual Defendants**

Section 20(a) of the Securities Act states:

Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

15 U.S.C. § 78t-1(a) (2007).

"In order to state a claim under Section 20(a) a plaintiff must show (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *In re Cable*, 321 F. Supp. 2d at 774-775 (internal quotations and citation omitted). A plaintiff must first state a claim for a primary violation under § 10(b) before it has standing to plead a § 20(a) violation. *Id.* (citing *Longman*, 197 F.3d at 686). Because Plaintiff fails to adequately plead a primary violation under § 10(b) against any Defendant, it also fails to state a claim against Defendants Blazer and Falcone for control liability under § 20(a). *Id.* Accordingly, the Second Claim against the Individual Defendants is dismissed.

**VI. Conclusion**

"In the Eastern District of Virginia, an amendment may be considered futile where Plaintiffs have previously had two full opportunities to plead their claim." *Iron Workers*, 432 F. Supp. 2d at 595. This case has been pending in this District since April 25, 2005. Plaintiff filed the Consolidated Amended Complaint on October 7, 2005, and the Complaint on March 10, 2006.

36

Plaintiff has had ample opportunity to plead allegations to comply with the PSLRA, either in a prior amended complaint, or by seeking leave of court under Fed.R.Civ.P. 15(a). It has not done so. Nor has Plaintiff indicated that any amendment could cure the deficiencies. In fact, Plaintiff has relied upon the present complaint and incorporated SEC filings.[19] Therefore the Court finds that leave to amend would be futile. *See* Fed.R.Civ.P. 15(a).

Therefore, for the reasons articulated in this Memorandum Opinion, the Court hereby dismisses with prejudice the First Amended Consolidated Complaint against all Defendants.

/s/

Liam O'Grady
United States District Judge

Alexandria, Virginia
September 12, 2007

---

[19] At the hearing, the Court inquired as to "what facts there are that Blazer or Falcone knew, or should have known, and recklessly disregarded information in reporting or in setting up these corporations to fail" (Tr. 62). Plaintiff's counsel responded (in pertinent part): "This is a case, your Honor, about the massive failure of internal controls. And I do believe that, fairly read, the allegations of our complaint, which must be accepted as true, according to the Supreme Court, and looking at the materials submitted the defendants submitted, including the Audit Committee report, and in particular the Price Waterhouse independent report, on pages 1238 and 1239 of the appendix, these are extremely damning findings. They are findings that are made against senior management and against the defendants. And it's a laundry list, your Honor, of abject deficiencies, that goes on for a couple of pages, single-spaced, in [sic] the failure of this company to maintain policies and procedures that would insure [sic] accurate financial reporting. Ultimately, the CEO and the CFO are responsible for that, your Honor" (Tr. 62-63).